for the Arnesses, the appellants. I'm going to reserve some time for questions and rebuttal. I don't think this will be very long. Starting with the 1995 claim, my main point to sum up the papers would be that if the damage was so significant and appreciable, then why is Allstate's adjuster, Mr. Sapers, communicating to Mr. Arness that, gee, I thought you had a good claim and I went up to bat for you? And why is he meeting him on the coastline with his son, engaging him in friendly banter, when the record reflects that this very same individual was the one who recommended denial of the claim? Why didn't Mr. Sapers just say, Mr. Arness, this is quite obvious. You had appreciable damage. You have no claim. Why run this senior, this ill, great citizen through this litany when it was so obvious? Moving forward to the 2000 claim, which is really the heart of our case, I'll concede that. I'll detain for just a moment. I must say I was a little unhappy with your reply brief in your selective quotation from Mr. Arness's deposition, who quoted only his statement when he says, well, I don't know, leaving out several pages that are immediately followed in which he said, well, I saw cracks here. I saw cracks there. I saw cracks there. It would have been more helpful to me if you had confronted openly what he had said and argued from that. Okay. I'm sorry. It was probably a space limitation. But really, the cracks that he saw were so de minimis. I mean, this wasn't a house where you walked in and said, oh, my goodness, a federal disaster. It would have been helpful to me if you'd quoted in full this testimony that worked against you and then said that. I apologize for that. It won't happen again. In 2000, we are not contending that CCP 340.9 creates any new rights. The Arnesses don't need any new rights. They've got a contract of insurance that provides all the rights they ever needed. And to suggest, as Allstate does, that they had no duty pursuant to that contract is ludicrous. They had a duty to adjust and pay, and they exercised the duty. Whether they had it or not, they exercised it. They demanded appraisal. They filed motions with the federal district court, insisting on their contractual rights under the policy. And then they abused those rights, dragging this claim out for four years. Not the lawsuit, the claim. There was a concurrent claim at all times, and it doesn't disappear just because someone files a lawsuit. Allstate had the chance to resolve this case and never be sued. We sent a letter the first thing we did when we got in this case, saying, if you want to pay the claim, do it by New Year's Eve, 2001. They didn't do it. Now, I saw that. Help me with my timing. I know you said you have your chance to settle it by New Year's Eve. After the statute is passed, it sort of revivifies these claims and allows what had been time-barred claims now to be filed again. Yes. Then the RNSs come back in and say, you know what, we'd like some money now, now that this new statute is in. Correct. How long before they, between the time they made their first request for payment, first request after the statute and that New Year's Eve deadline? The chronology is that in mid-2000, before the statute became effective, but everyone knew about it, it was common knowledge, that's when the RNSs tendered Allstate. It was mid-2000. But the statute wasn't passed yet? No. It was passed, but it did not become legally effective until the beginning of the next year. I see, okay. But everyone knew it was coming, and Allstate, for five months, said they couldn't find a file. This made the RNSs a little uneasy. They then retained counsel. Then another year goes by, and the first thing we did was send a letter to Allstate saying, if you'd like to resolve this on a claim basis, we're going to sue you. I'm not saying we weren't planning to do that. That's what we do. But we gave them the opportunity to come out and inspect. Again, they'd already inspected the house in 1995, so technically they should have known everything they needed to know. But we invited them back in. If you would like to adjust, we can do it, and you can resolve this claim, and there will be no lawsuit, and we'll say goodbye to each other on a peaceful basis. Allstate wasn't interested. And they actually inspected the house in August, and it's New Year's Eve of that year that you say, that's our deadline for settlement? Yes. And, you know, if New Year's Eve came and they said, hey, we need another month, we're close, we could have worked something out. But there was no intention to exercise that option that was afforded. I backed up to really a procedural point. Yes. You tried to file an amended complaint that set out all of this post, after the statute came into play, the claim that's post-2000. The district court never ruled on that. No. The summary judgment papers indicate that Allstate took the position that the district court couldn't rule on it because it wasn't in your operative pleading. Correct. So a lot of time is spent in the briefs talking about this, but what's your view as to whether the district court ever decided this point, as to whether there was bad faith in the second go-around? You know, since you need to look at the record, and there isn't one, it's a good question. And that was very frustrating to me. And we also filed some type of petition to ask him to rule on that request. If you look at the summary judgment order, he's talking about the 95 claim. Right. So, and it's all real interesting to speculate about what the district court might have done with regard to the post-lawsuit conduct and the conduct after the reopening of the claim period. But is there, what is the plaintiff's view as to whether that issue's been determined or not? Well, it is determined because there's a final judgment. And once this is over, we won't be able to come back because of res judicata. That motion should have been granted. And frankly, it was the product of discussions with counsel. Well, I can, if I can, I'm sorry, if I can just refine my question. Yes, there's a final judgment, which you obviously, I mean, we have, there obviously is a reason for you to be here and argue this point on appeal. But I'm, what I'm trying to get at is whether the district court ever decided this issue. In other, in other words, there's a final judgment, but there doesn't appear to be a decision, at least I couldn't find a decision from the district court that explicitly says the conduct of all state post, the, the enabling statute is or is not bad faith. I think the court completely ignored that aspect of the plaintiff's case in denying the motion to amend the complaint. How would you have this court address that? I think the remedy would be to remand and rule on that amended complaint and put that at issue. That's all we ever wanted anyway. Well, all we could do is, following through the logic of that, would be to say that the district court abused its discretion in failing to rule on the amendment and, and that you need to be allowed to amend the complaint. But what more could we do, if anything, since there's no other way? Procedurally, I have to agree with you. Although all state's papers take the position that, well, the district court obviously ruled on it and didn't think much of it, and that's why they never mentioned it. I tend to agree with the panel here that the procedural remedy is to have a... Well, it's a question. There's nothing really, I guess, I, it always makes me nervous when lawyers say they agree with me because I really am just tracking through a question. Is there anything else procedurally that the appellate court could do if we were to conclude that the district court simply failed to address the 2000 issues, other than send it back for the district court to do it? In other words, how could we agree with you on the merits procedurally? You've argued the merits and what they did wrong in 2000, but I don't understand from your perspective how we could even reach that. Maybe you can't, but I, I think you can because it seems like the, the court was acutely aware of what was going on in 2000, having ordered the appraisal, and then you get an appraisal result, which is a fact that Allstate glosses over in these papers. It's significant. It's higher... Was that issue even briefed, though? I mean, did, did, did the district court have full briefing as to whether the 2000 claim was bad faith or not? They sure did from my end. I, I briefed it. Even though Allstate made a procedural objection that that wasn't in play without the motion to leave to amend? Allstate argued it as well. All right. So, so your view is that there actually is a complete, there's no decision by the district court, but there's nothing you could add if the case were remanded on the issue of whether there was bad faith post-2000? No. I mean, if we go back, it'll be very redundant. I've, I've argued the 2000 claim. We've got an appraisal result, which is higher than the number that the plaintiff even asked for. I mean, it seems pretty significant to me. But that, that happens. Let me ask you a different question. What right, or what, maybe I'll say it this way, what duty does Allstate have as a result of the new statute that repeals or gives us a new statute of limitations? Do they have a, is there anything, we've had an argument from Allstate in the briefs that the only thing that that did was to extend the statute of limitations. But since Allstate had already sort of dealt with the claim, it does not have a new contractual and then, I guess, insurance-based obligation to settle in good faith. It just allows you to file suit again. What's your response to that argument? I would only agree with half of that. They don't have a new duty. They have the same old duty they had back in 94. It's been revived. That's the definition of revival. And to say that a contract of insurance does not impose legal duties just would turn an entire body of case law on its head. The purpose of the statute, and if you read it, it doesn't just revive lawsuits. It says claims or causes of action. So the claim was revived and the best evidence of that is the fact that Allstate jumped into the claim and exercised its claim rights. It demanded inspections of the property on repeated occasions. It demanded an appraisal pursuant to the policy. You can only do that if you have a claim open. And what was the total elapsed time between the time you made your first sort of revived claim and the final settlement? It would be mid-2000 to 2004, so it's just under four years, which seems to me on its face a quite unreasonable amount of time to tell someone how much it costs to fix a house. And there's nothing now before us challenging the amount of the ultimate settlement. We're now just into the bad faith question. No. It wasn't a settlement, though. It was an award, which has been reduced to judgment. Thank you for your time. Thank you. You have some rebuttal time remaining, if you choose to use it. Mr. Brooks. Thank you very much, Your Honors. May it please the Court, John Brooks for Defendant Allstate. I would like to start, please, by reviewing some of the facts that are undisputed as to both the 1995 portion of the claim and the post-2000 portion of the claim, particularly with reference to Judge Fletcher's questions about chronology. And after that, I'd like to address some of the specific procedural issues that were raised by Judge Fulton and others. With regard to the 1995 portion of the claim, it's Allstate's position that the facts about what Allstate knew back in 1995 are undisputed because they're captured in black and white in a recorded statement taken from Mr. and Mrs. Arness at the time. On the face of those admissions made contemporaneously in 1995, there are admissions from both Mr. and Mrs. Arness that they were aware of numerous damages, which in their own words, they said they saw right after the earthquake, shortly after the earthquake, or since the earthquake. Then there were also many additional damages that they described that are less clearly pinned down in time. But if you focus solely on those that they admitted to seeing right after the earthquake, it's Allstate's position that that damage was preachable under controlling case law. The court doesn't need to go that far and find that the damage was in fact appreciable. It only needs to find, because we're limited here to the bad faith issue, of whether there was a reasonable question as to whether that damage was appreciable. The controlling law is a potential LMI case, which equates appreciable with something that a reasonable person would think is more than normal wear and tear, such that they're on covered loss. And I think clearly that's the case that's established here by the undisputed facts. I can address with regard to the remark made by counsel about the adjuster going up to bat for the Arnesses, the argument made based on that, if you'd like, because there are some timing issues which have not been fully conveyed to the court on that, but I don't know if the court has interest in that issue. Personally, I'm a lot more concerned about the 2000 claim. Yeah, I'd like to know what your view is about the amended complaint and what we're supposed to do about the absence of an express ruling. Right. It appears to me, Your Honor, that there's no dispute that despite the fact that the amended complaint was not ruled upon, that the plaintiffs did, in fact, brief and argue their position with regard to all states' alleged bad faith delay in the post-2000 time period. There is a paragraph, I think it's on page 10, but my memory may be fooling me, of the plaintiffs' opposition brief where they address it and they address it in a separate statement response. I understand that they briefed it, but I'm only speaking for myself here, but there's no ruling on permission to file the amended complaint. There's no explicit discussion by the court of the events in 2000, so the fact that it was briefed doesn't really, to me, suggest that the district court actually decided it. And so it could be briefed extensively, but if the court doesn't make any decision, I don't know where that leaves us. I'd like to correct one thing, which I think is not quite right about that statement. It is true that in connection with the district court's discussion of bad faith, the court focused on the 1995 conduct. But if you look at the court's discussion of punitive damages, you will see that the court compares all states' conduct in its 2000 estimates, its reliance upon experts, to the evidence that plaintiffs were adducing during the post-2000 time period. Where would you point to? Because I see, I'm looking at the excerpt 751 to 753, which is where the discussion is of punitive damages. And where is the court clearly focusing on anything to do with 2000? It may be there, but I just didn't read it that way myself. That doesn't mean I'm reading it correctly. Let me try to assist the court in that. On page 752, beginning at line 16, it states, it is clear that the RNSs in all states are engaged in a longstanding dispute over an appropriate estimate of the damages suffered during the Northridge earthquake. While the parties disagree about how to resolve this dispute, plaintiffs have failed to set forth specific facts showing that there's a genuine issue for trial on whether all states' behavior in this matter rose to the level of oppression, fraud, or malice. And that is in there. You don't have a like excerpt with regard to the bad faith claim. I'm sorry, what excerpt? There's not an excerpt relating to the bad faith claim that deals with the post-2000 conduct. That is true, Your Honor. The court's silent about that. And I understand, I take your point, that the fact that the case is in the big-picture context of the case helps your argument, but there'd be no punitive damages without the bad faith claim. And there's no discussion of the bad faith claim post-2000. I would suggest this as a way to resolve the procedural issue. If the court had issued a one-line order saying, motion granted, this case and all the evidence would come up to this court for de novo review. So I don't think that it is important whether or why the court analyzed the bad faith issue the way it did because the court, this court, has in front of it the evidence that is required to do a de novo review regardless of the reasoning. So is it your view that we ought to review de novo all the issues about 2000 as well as all the issues about 1995? It is our position that the court should review all the issues as to 2000 that were briefed in the summary judgment papers. In other words, it's fine with you if we address the 2000 claim and hold against you without remanding the district court to find out what the district court wanted to do. Procedurally. I mean, obviously, you're not – we understand you're not conceding the merits. Right. Procedurally, you'd have no objection if we did that. Procedurally, I don't. I want to point out that the arguments regarding appraisal that have been made in the papers on appeal were not made below in connection with the summary judgment motion. So I don't think that the arguments regarding alleged conduct during appraisal were properly put before the district court in those papers. That's the thing that bothers me, you know, because we could do a, well, let's assume that the motion for leave to men was granted and then we would be doing a de novo review as if there had been such a ruling. It's not a full record. I mean, the facts that underpin the bad faith claim and the punitive damages claim as to the 2000 events, post-2000 events, were not fully developed in the district court. And so we'd have to do a de novo review of the appraisal aspect of the claim without any proceedings in the district court. I would like to clarify something about chronology that I think addresses that issue. The Second Amendment complaint, the proposed Second Amendment complaint, was filed on February 18th, 2003, the same date on which the plaintiff's opposition papers to the summary judgment motion were filed. As of that point, the appraisal motion had already been filed and, in fact, had already been ruled upon. And issues that were raised by plaintiffs in this case with regard to whether there should be an arbitrary deadline put on appraisal, et cetera, had already been ruled upon by the court. And yet, even in the proposed Second Amendment complaint, there is no allegation in there that anything was untoward with respect to the appraisal. So even the proposed Second Amendment complaint, if it had been ruled upon, didn't put the appraisal issue into play. There was time to have put it into play because the opposition and the Second Amendment complaint were filed after the appraisal had already been ordered. Plaintiffs made the decision in their opposition to take one tack with regard to attacking Allstate's post-2000 conduct, and that was just to look at, just to say, 2000-2003, there must be a delay in there somewhere. What Allstate has done is to set forth very clearly an undisputed timeline. As Judge Fletcher observed, there was no issue with regard to 340.9 reviving anything until January 1, 2001. Allstate was first permitted onto the property for an inspection in August 2001. It was determined in the fall that there were geotechnical issues that needed to be looked at because there was a descending slope behind the R&S's house, and there's a question about whether cracks in the flatwork of the backyard were caused by soil conditions or by the earthquake. Allstate obtained that, a second inspection for the geotechnical engineer in December 2001, received the geotechnical engineer's report January 9, 2002, immediately transmitted it to the structural engineer, who was the one who had said he needed that to finish his report. Allstate got the structural engineer's report in April 2002. It arranged a final inspection of the property because Allstate's contractor wanted to go back with the benefit of these reports in hand, finish his job. He did that on May 27, 2002. On June 11, June 16, 2002, Allstate tenders its $136,000,000,000,000,000,000,000,000,000,000,000,000,000,000 offer less the deductible. It's also worth pointing out that in reaching that $136,000,000,000,000,000,000,000 estimate, Allstate didn't rely solely on its own experts. It's undisputed that Allstate relied on both its experts and plaintiff's experts in trying to figure out what the appropriate amount to offer at that time was. I would point the Court to Excerpts of Record, page 576, which is Plaintiff's response to Allstate's separate statement of facts. For example, I want to put a little flesh on the bones so the Court understands the issue there. For example, Allstate's structural engineering expert, Ficcidenti, in the case of Wagner, said there was no further work needed on the stucco. That's at page 301 of the excerpts. Yet Allstate goes ahead and allows for certain stucco repairs. That's at page 417 and 422, because that was in the plaintiff's expert's opinion that there was stucco damage. Similarly, with regard to foundation, Allstate's expert says, all the foundation repairs have been done already by the FEMA-related repairs. That's page 303. But Allstate allows some to fix cracks in the foundation. That's page 417. With regard to the garage slab, Allstate's soils engineer said the big crack in the garage slab is probably due to that downward creeping soil phenomenon. That's page 293. But Allstate paid to fully replace the garage slab despite the fact that there's a real causation question about what caused that crack, a causation question I would note that's exacerbated by the passage of time. It gets a lot harder after time. There are similar issues with regard to repairing the fireplace and bathroom marble. So it's not a case where Allstate said, we're going to go strictly by the letter with what our experts said, and we're going to ignore what your experts said. But again, as page 576 shows, it's undisputed that Allstate relied upon both experts, which brings this case squarely in line with this Court's decision in Guevara and the California Appellate Court of Authority in Chateau-Chambray and Fraley, that a reasonable reliance on expert opinion is enough to create a genuine dispute about the amount due. We think that's what the undisputed facts show here. And the appraisal amount comes in about $100,000 over that 136. $97,000, Your Honor. I think we have no more questions, so you can wrap up or be done. Your choice. The last thing I would note in light of the procedural issue particularly raised here is that if for any reason the Court determines that the bad faith proceedings need to be remanded because the court below didn't address them specifically or for any other reason, the issue of the punitive damages is severable from that. The district court did address the punitive damages issue, including 2000 through 2003 conduct. In a conclusion, there's not a lot of reasoning as to how it concluded that. It just said overall, all states' conduct was not oppressive. True. But I would submit that if for any reason there's going to be a partial remand, the Court can and should at a minimum address the and deal with the punitive damages issue and affirm there. Would Your Honor like me to address the 340.9 issue and the question of what's revived? No, I think it's in your briefs and I heard the response. Thank you. Thank you very much. There is some rebuttal time remaining. I think wrapping it up, what we end up having is two parties that finally agree on something that this is probably before you, de novo. As Judge Vogel pointed out, though, the appraisal never really was included. So my clients are being robbed of their argument for the appraisal, bad faith. The reason I'm not up in arms about that is because the damages that flow from that are largely mooted by the large appraisal award. In other words, I can't come in and say there was a biased appraiser on that panel and that's why the award was so low. So I'm not intending to make a big deal out of it. The other element of damages that did result from their unreasonable appraisal conduct is the excessive delay. For six months, they won't even appoint their appraiser, which is something that they do every day, then they won't agree to a deadline for the completion, which, frankly, is routinely ordered by district judges. They always say, get this done by X date. Why would an insurance company march into court and say we refuse to submit to a deadline if their agenda was to promptly and reasonably resolve a claim? That's a strange conduct. So in conclusion, the claim I think is before you, de novo, by the concession of both parties, and I think that's where we stand. I will say that the appraisal award being higher than the plaintiff's number, I don't think happens as routinely as Your Honor mentioned. I've never seen it happen before. The more common scenario is for something right in the middle or at one of the party's numbers. This was unusual, and I think it shows how unreasonable out-of-state's numbers were. They're telling you that they conceded all these points and benevolently paid things they shouldn't have, yet they're off the mark by $100,000. Something's wrong. Thank you very much for your time. Thank you, counsel. We appreciate the arguments of both parties. The case is submitted. We also have a case of Shaw-Williams.
judges: Graber, W. Fletcher, Fogel